HUTTON *v.* HUTTON, EXECUTOR, ETC.

No. 41428 April 4, 1960 . · 119 So. 2d 369

218

*Watkins & Eager,* Jackson; *John S. Holmes,* Yazoo City; *Pat M. Barrett,* Lexington, for appellant.

*Henley, Jones & Henley,* Jackson; *Parham H. Williams, Jr.,* Lexington; *J. B. Hutton, Jr.,* Mitchellville, Md., for appellees.

LEE, J.

Sam D. G. Hutton, by his bill of complaint against J. B. Hutton, Jr., Mrs. Rosalind Hutton Johnson, and Mrs. Mary McCutchan, sought to require specific performance by them of an alleged executory contract to sell to him a 507 acre tract of land, known as the Cooper Place, in Holmes County, Mississippi.

The defendants had received their interest in this land under the last will and testament of their mother, Mrs. Rosalind Gwin Hutton, who died on November 23, 1955. The testatrix had divided the place into three separate tracts, insofar as the surface was concerned, and had left the east 169 acres to Mrs. Johnson, the center 169 acres to Mrs. McCutchan, and the west 169 acres to J. B. Hutton, Jr. Insofar as mineral rights were concerned, the place was divided into five separate tracts of 101 2/5 acres each, and these rights in those tracts

were devised to Sam, Mrs. Johnson, Mrs. McCutchan, Susan Van Houten Smith, and Charlton D. Hutton.

The alleged contract to sell arose in this way: On March 2, 1957, Sam, from Tchula, Mississippi, called his brother-in-law, Russ M. Johnson, husband of Mrs. Rosalind Hutton Johnson, over the telephone at Jackson and expressed his desire to buy the Cooper Place. Johnson let the defendants, who were all in the city at the time, know what had happened, and they, in turn, formulated their proposition for the sale, based on two letters, which Johnson, by prearrangement, delivered to Sam at Canton that afternoon.

The letters were dated March 2, 1957. One was as follows: "Dear Sam: Before we transact business with you it will be necessary for you to give written expression of regret for and retraction of the statements you made to Mary Ryburn and Charlton on March 1, 1957. Yours sincerely, /s/ Rosalind /s/ Jim." The other, signed by J. B. Hutton, Jr., Mary Ryburn Hutton McCutchan and Rosalind Hutton Johnson, was as follows: "We will sell our rights by warranty deed in the 497 acres, more or less, (consisting of 209 acres of cultivated land and 298 acres of woodland), being the land devised us* by the will, of Mrs. R. G. Hutton, and duly described in it, for $30,000 cash, reserving our mineral rights therein as given in the will. We will waive interest and fees on the 1956 rent note, and accept $1600 principal, as offered by you. We will ask you to pay the $1600 balance of 1957 rent agreed to with Mother and due 1 November 1957, because this item is governed by the will, as an asset applicable to estate debts, and the balance thereafter left is ¼th Susan's. We will pay 1957 taxes. We would like for you to accept this offer, or decline it by letter within 2 weeks, and hold the offer open that long. If you accept it, and use due diligence, we will of course give reasonable time to close the transaction. *excluding of course the 112 acres in the cypress brake in a separate tract."

On March 4, 1957 Sam wrote as follows to Mrs. Johnson: "Any statement I made to any of you that any of you took offense to I express my regrets & or hereby retract same." On the same date, he had his attorney to prepare a deed to the property and the same was left in the hands of W. H. Cox that day.

In a lengthy letter dated March 5, 1957, J. B. Hutton, Jr., among other things, advised Sam that he would have to pay over cash in exchange for the deed. On the same date Mrs. Johnson wrote Sam as follows: "Before Mary Ryburn, Jim and I confirm in writing any terms offered since the letter sent to you on March 2, 1957, and signed by the three of us, it will be necessary for you to comply with the requirement of the letter sent to you on the same day, by the same messenger, and signed by Jim and me.

"Mary Ryburn, Jim and I have agreed that every binding term or condition of any proposed business transaction between you and us must be in writing.

"Until you receive further written terms from the three of us the proposition stands as of our letters of March 2, 1957." On the next day, Mrs. Johnson wrote Sam again as follows: "I received today, your note of March 4, 1957.

"The letter sent to you on March 2, 1957 by Jim and me was very specific. It applied to, and specified, a definite time, place and persons.

"I refer you once again to our letter of March 2, for the note I received from you today does not fulfill its requirements."

On March 6, 1957, Sam wrote the defendants at Jackson, Mississippi as follows: "This is to acknowledge receipt of your letter of March 2, 1957.

"I hereby accept your offer as set forth in this letter.

"Upon the execution of the deed which I left in Mr. Harold Cox's hands on Monday March 4, 1957, I will deliver to Mr. Cox for said deed a cashiers check for

$30,000.00, and also a cashiers check for $3,200.00 to cover rent for 1956 and for 1957.

"Please have Mr. Cox notify me by telephone at 4071 Tchula (Collect) when he is ready for me to deliver checks."

On March 8, 1957, Sam wrote Mrs. Johnson and J. B. Hutton, Jr. at Jackson, Mississippi as follows: "In regards to your letter of March 2, 1957, which was delivered to me by Russ at Canton, and for which I suppose you have a copy.

"This is my written expression of regret for and retraction of the statements I made to Mary Ryburn and Charlton on March 1, 1957." Mrs. Johnson, on March 9, 1957, acknowledged receipt of this letter as follows: "Your letter of March 8, 1957 was received this morning.

"I have sent it, along with your first registered letter which was received earlier in the week, to Jim.

"As Mary Ryburn is here in Jackson at present, she has already had the opportunity to read these two letters from you.

"When Jim has had the same opportunity you may expect a written reply from the three of us."

In regard to the preparation of the deed, Mrs. Johnson, on March 20, 1957 wrote Sam as follows: "In my most recent letter from Jim, which came yesterday, he suggested that I write a note to you to let you know that we are working on the terms of a deed based on the offer you made to purchase his, my and Mary Ryburn's parts of the Cooper Place.

"When this work is done, we will of course send a copy to you so that you too can review it and give it your careful consideration.

"I hope that you and yours are well—" In another letter to him, of date of April 13, 1957, she said: "We are sending you a copy of the draft of a deed to Mother's part of the Cooper Place upon which we have been working for sometime, as you already know.

"Jm, Mary Ryburn, and I have given it our careful thought, consideration and approval. We are sending it to you now for your review and consideration. We are also sending a photo of the map of the place.

"If you approve the deed, or if you wish to make changes for our further consideration, please return *both* the deed *and* the map *directly* to Jim or to me. If you desire any other correspondence regarding the deed, please also send that *directly* to one of us.

"A copy of the deed has been sent to Susan and she has been asked to give her views, as has Charlton. Until we hear from them we cannot say finally whether the option provided in the deed, for a survey of mineral boundaries with a description and plat shall be exercised now and made a part of the deed, or whether this shall be done later.

"In order to avoid further delay, we are sending this draft of the deed to you for your consideration, while Susan and Charlton also have it before them for the same purpose.

"When, and if, we have the unanimous consent of all parties concerned, Jim will draw the final draft with acknowledgements.

"I trust you and your family are well."

On April 17, 1957 Sam received through the mail what was denominated as "Agreement and Warranty Deed Covering Rent and Exception Therefrom of Minerals in Place Thereunder", together with a plat of the property. The instrument covered six cap sized pages, written in single space, and intended for execution by the three defendants, by the complainant, and also by Charlton D. Hutton and Susan Van Houten Smith, as devisees of mineral rights.

On May 20, 1957 Mrs. Johnson wrote Sam as follows: "Mary Ryburn, Jim and I want to know immediately if you have any further interest in the proposed sale of the land in Mother's part of the Cooper Place." And again on May 25, 1957 she wrote to inform him as fol-

lows: "Our offer to sell to you Mother's part of the Cooper Place expires five days from the date of this letter —"

Sam testified that, on May 30, 1957, he wrote the defendants at Jackson, Mississippi the following letter: "I acknowledge receipt of your letter of May 25, 1957.

"I hereby reaffirm my acceptance of your offer as set forth in your letter of March 2, 1957.

"I hereby reject your Agreement and Warranty deed in draft form sent me under separate cover about April 17, 1957, and deny that it in any way complies with your offer as set forth in your letter of March 2, 1957." The defendants denied that they received the letter.

On May 31, 1957 Mrs. Johnson wrote Sam as follows: "In view of your failure to acknowledge all previous correspondence since April 13, 1957 and in view of your failure to reply to all inquiries during this same period of time, as well as your failure to comply with the stipulated conditions for completing the proposed sale of the land in Mother's part of the Cooper Place, we are unwilling to hold the proposals open longer. You are hereby thus informed. The proposal is dropped. We do not want to reopen it or to attempt further negotiations."

At the conclusion of the evidence, the learned Chancellor prepared and delivered a written opinion. He held that the defendants' offer of March 2, 1957 was to sell for $30,000 cash and the payment of the rent notes for 1956 and 1957; but that the complainant's letter of acceptance stated that, upon the execution of the deed which he had left with Mr. Cox, he would deliver to Mr. Cox a cashier's check for $30,000 for the deed and a like check for $3,200 to cover the rent for 1956 and 1957. Holding that a cashier's check is not actually cash, the Chancellor concluded that the acceptance was not in strict accordance with the terms and conditions of the offer, and that it amounted to a counter proposal or rejection of the offer. For that reason, he

declined to decree specific performance. At the same time, he also referred to the fact that the deed and escrow agreement, which had been left with Mr. Cox, made no mention of the payment of the two rent notes in the sum of $3,200 for the years 1956 and 1957. In the suit which had been filed by J. B. Hutton, Jr., as executor, against Sam for the recovery of the rent notes, and which has been transferred from the circuit court to the chancery court and consolidated with the specific performance action, he awarded a decree for the rent and interest and attorney's fees.

From the final decree, Sam appealed.

The appellant contends that the decree, denying specific performance, based on the finding of the chancellor, is manifestly wrong because, he says, the offer, made by the appellees in their letter of March 2, 1957, was unequivocably accepted by his letter of March 6 thereafter; that the offer to sell the property "for $30,000 cash" meant a cash sale as distinguished from a sale on terms or credit, and did not mean that the appellees were each to be actually paid by the appellant in specie or currency; and that the third paragraph of his letter with reference to the execution of the deed, left with Mr. Cox, and the delivery of cashier's checks for the consideration and for the payment of rent, were mere suggestions or requests looking to the expedition of the performance of the consummated contract.

On the contrary, the appellees say that the acceptance was not effected; that it introduced new terms and constituted a counter-offer, and therefore amounted to a rejection; that a cashier's check is a substantial variance from the term "cash" as used in the offer; that the appellant in fact abandoned the proposed contract; and that he was not entitled to specific performance on account of subsequent inequitable conduct.

It is definitely settled that the words of a contract should be given a reasonable construction, and that courts "must, if possible, ascertain and give effect

to the mutual intention of the parties, so far as that may be done without contravention of legal principles". See Rubel, et al., Executors v. Rubel, 221 Miss. 848, 75 So. 2d 59, and the authorities there cited.

 This Court, in Welch v. Williams, 85 Miss. 301, 37 So. 561, observed that the general rule, in reference to the enforcement of specific performance of contracts, is that "the contract must be specific and distinct in its terms, plain and definite in its meaning, and must show with certainty that the minds of the parties had met and mutually agreed as to all its details upon the offer made, upon the one hand, and accepted, upon the other. If any of these requisites be lacking, specific performance will not be decreed by a court of equity." This rule was reaffirmed in Philp v. Dana, 121 Miss. 697, 83 So. 745, and Fowler v. Nunnery, 126 Miss. 510, 89 So. 156. See also 12 Am. Jur., Contracts, Sec. 53, pp. 543-544; Williston on Contracts, Secs. 72 and 76, pp. 127 and 132.

 Beyond question, the appellees, by their letter of March 2, 1957, made an unconditional offer to sell to appellant, by warranty deed, their rights in the 507 acres of land, more or less, devised to them by the will of their mother, for $30,000 cash, with an express reservation to them of their mineral rights as given in the will. Besides, their demand as to payment of the 1956 and 1957 rent and their assumption of 1957 taxes were clearly stated. They thereby agreed to hold this offer open for two weeks and to give appellant the right to accept or decline by letter within that period of time. The offer was certainly clear and unambiguous; and, if it was accepted in the manner required, the contract was binding on all of the parties. Holifield v. Veteran's Farm & Home Board, 218 Miss. 446, 67 So. 2d 456.

There was every reason for the court to do so, and it found that the required apology was adequate and sufficient.

The question is whether Sam's language, to-wit, "Upon the execution of the deed which I left in Mr. Harold Cox's hands on Monday March 4, 1957, I will deliver to Mr. Cox for said deed a cashiers check for $30,000.00 and also a cashiers check for $3,200.00 to cover rent for 1956 and for 1957", constituted a counter-offer and therefore amounted to a rejection of the appellees' offer, or whether it was simply a suggestion to expedite the performance of the consummated contract.

In Williston on Contracts, Vol. 1, Sec. 79, p. 261, it is said: "Frequently an offeree while making a positive acceptance of the offer, adds as a request or suggestion that some addition or modification be made. So long as it is clear that the meaning of the acceptance is positively and unequivocally to accept the offer whether such request is granted or not, a contract is formed." See also 91 C. J. S., Vendor & Purchaser, Sec. 31b, p. 882, where it is said: "If an offer is accepted as made, the acceptance is not qualified or conditional because of the expression of a hope, request, or suggestion, or because of the insertion of an immaterial variation or condition."

In Crenshaw Bros. Seed Co. v. Rauch, 112 Miss. 330, 73 So. 53, the appellee and appellant, by correspondence, had agreed to sell and purchase, respectively, 450 bushels of peas f. o. b. Tampa, Florida; and the appellant, by letter, confirmed its agreement to purchase the peas, "if first-class stock". The appellee had shipped 175 bushels of the peas before the receipt of the above mentioned letter. But because the communication called for "thoroughly clean peas and first-class stock", the appellee, according to his version, considered the contract canceled as he had not sold that grade of goods. This Court, in holding that the appellant was entitled to a peremptory instruction for such damages as its sustained, said: "If the sort of peas mentioned in the plaintiff's letter were not the kind stipulated for in the original contract, the appellee could have insisted on the

appellant standing by the contract and receiving the peas contracted for. The appellant received and paid for one hundred and seventy-five bushels of the peas contracted for, and the appellee could not relieve himself from his contract without offering to carry it out under the terms as originally stipulated. The appellee not only failed to tender a performance of his part of the contract, but repudiated the contract by a positive refusal on his part to carry it out." See also Turner v. McCormick, 67 L. R. A. 853, a West Virginia case; Martindale v. Fiduciary Counsel, 26 A. 2d 171, 30 A. 2d 281, a New Jersey case; Skinner v. Stone, 222 S. W. 360, an Arkansas case; Rucker v. Sanders, 109 S. E. 857, a North Carolina case; Whelchel v. Waters, 111 S. E. 25, a Georgia case; Carver v. Britt, 85 S. E. 2d 888, a North Carolina case; Valashinas v. Koniuto, 124 N. E. 2d 300, a New York case; Horgan v. Russell, 140 N. W. 99, a North Dakota case.

For instance, in Martindell v. Fiduciary Counsel, supra, it was said that "A good acceptance of an offer makes the 'contract', even if there is added to the acceptance a proposal relative to fulfillment of the contract". Likewise in Horgan v. Russell, supra, it was held that a demand, in the instrument of acceptance, which pertained not to the acceptance but to the performance thereof, did not invalidate the acceptance. To the same effect is Skinner v. Stone, supra, where the appellee, by his letter of July 5, accepted appellant's proposition, contained in his letter of June 28. The opinion said that the statement about sending the draft to the Merchants' & Farmers' Bank was not an additional and unagreed upon condition, but was a mere suggestion to expedite the consummation of a contract which the letter itself closed by accepting unconditionally appellant's offer to sell.

The appellees evidently understood Sam's letter of March 6, 1957 to be an acceptance of their offer. Their letters of March 20 and April 13 are convincing evidence to that effect. The deed, which Sam had proposed, ob-

viously did not meet their approval because they thereafter submitted their own form to him for review and consideration. At no time did they make any objection whatever to his suggestion of payment of the consideration and the rent by cashier's checks. The time for actual performance by the appellant in the delivery of the consideration never did arrive. Before the form of deed was agreed upon, the appellees repudiated their agreement.

As heretofore stated, the deed, which the appellees tendered, was prolix in form. Besides, it contained extraneous matters, and did not conform to the written offer to sell. It no doubt was the obstacle upon which the consummation of the contract foundered.

Appellees say that Fowler v. Nunnery, supra, is decisive in their favor in this case. But in that case, Fowler, living at Picayune, replied to Nunnery, living at Magnolia, "I will take fifteen hundred dollars cash for the land I own near Chatawa; this is net cash." Nunnery, in reply, said: "Mr. W. C. Fowler, Picayune, Miss.— Dear Sir: Replying to your letter of the 2nd inst., I accept your property at Chatawa, and herewith inclose deed for same, to which you will attach draft for fifteen hundred dollars and send same to the Citizens' Savings Bank, Magnolia, Miss., for collection." The opinion specifically pointed out and emphasized these facts: (1) The offer to sell was for net cash; (2) Nunnery's letter was not an unqualified acceptance of that offer; (3) In the previous correspondence, nothing had been said about whose duty it was to draft the deed; (4) The offer to sell was silent as to the nature and character of the deed which Fowler would make, whether quitclaim, or a special or general warranty; (5) Nunnery assumed the duty and wrote a deed; (6) This deed contained more land than Fowler owned and the description was also erroneous; (7) When Nunnery asked Fowler to sign the deed, he did not tender to him in cash the consideration, but instructed him to draw a draft

on a bank at Magnolia, Mississippi; and (8) Since Fowler was required to send the deed to another town for collection, because it was not accompanied by a tender of the consideration in cash, the offer of sale was not accepted according to its terms.

That case is unlike the one on the present appeal. Here the appellant made an unqualified acceptance of the appellees' offer. The appellees had agreed to sell their rights "by warranty deed". The appellant, showing his full purpose to comply with the terms of a cash, rather than a credit, sale, suggested that he would deliver for the deed cashier's checks for the consideration of $30,000 and the rent of $3,200; and Mr. Cox lived in the City of Jackson, where Mrs. Johnson, the apparent spokesman of the defendants, also lived. It is clear that the contract in this case failed of performance on account of disagreement as to the terms of the deed, when, under the contract, there was no room for any substantial difference of opinion.

The appellees' offer to sell the property for $30,000 cash was an offer of a cash sale as distinguished from a sale on credit. "Cash" is the antonym of "Credit". See Lee v. Cutrer, 96 Miss. 355, 51 So. 808. In that case, Article 3 of the charter of the Bank provided: "The stock of said corporation may be paid for in cash or in monthly installments, or on check as the board of directors may from time to time direct, and the board of directors shall have the right to provide for the issuance of stock as payments are made and may receive payments in full of all stock subscribed for from any subscriber on such terms as may be fixed by general order of the board of directors." The appellee paid for his stock with a fee of $250 for services in the organization and the agreed price for furniture and fixtures in the amount of $1,750. The Court said that it was manifest that the word "cash" was used "not to designate the medium of payment, but as a term meaning the opposite of credit," and that the appellee had paid his subscrip-

tion to the capital stock of the bank in full. See also Van Decar v. Streeter, 240 N. Y. S. 492, a New York case; Duprey v. Donahoe, 323 P. 2d 903, a Washington case; Parrish v. American Railway, etc. Corp., 256 P. 590, a California case; McInnis v. Brown County, 41 S. W. 2d 741, a Texas case; State v. Woodward, 93 So. 826, an Alabama case; and Palliser v. United States, 136 U. S. 257, 34 L. Ed. 514.

The appellees, from their offer, did not expect to sell the land to the appellant on a credit. The sale had to be a cash transaction, that is, for "ready money or money in hand, either in current coin or other legal tender, or in bank bills or checks paid and received as money". Palliser v. United States, supra. According to the appellant's suggestion, when the deed had been executed, he would deliver the cashier's checks to Mr. Cox, whose office was in the City of Jackson. While a cashier's check is of course not currency, it represents, as a general proposition, ready money as distinguished from an ordinary credit. Undoubtedly the appellees did not contemplate that the appellant should, simultaneously with the delivery of the deed, produce coin and currency of the realm and actually pay the same over to them. But if they did so intend, the appellant would have had the right to conform thereto at the time of the exchange. Actually, however, they at no time raised any question as to his suggested mode of payment.

In 92 C. J. S., Vendor & Purchaser, Sec. 252a, p. 117, it is said that "The purchaser is excused from payment if performance on his part is prevented by the conduct or interference of the vendor", and under paragraph b. thereof, p. 119, that "the purchaser is generally not bound to go forward with performance on his part as long as the vendor is in default with respect to acts required of him by the terms of the contract." Mrs. Johnson's letter of May 31, 1957 brought the negotiations to an end. Obviously the only thing that would bar the appellant is the statute of limitations. But, since

the suit was filed July 23, 1958, there was of course no bar of the action.

■■ Appellees further say that appellant was guilty of inequitable conduct on account of the fact that, subsequent to the contract, he appealed on behalf of his minor daughter to the Supreme Court from a decree of the Chancery Court of Hinds County, in the case of Hutton v. Hutton, 233 Miss. 458, 102 So. 2d 424, and thereby attacked the title of Mrs. Johnson; and besides, that he was in default in the payment of rents.

But the suggested deed, which appellant had his attorney to prepare, expressly provided in one paragraph thereof as follows: "The undersigned Rosalind Hutton Johnson is the same person as 'Rosalind Gwin Hutton' mentioned in Part I of Item III of said Last Will and Testament" of Mrs. Rosalind Gwin Hutton. It was under that part of the will that Mrs. Johnson received her bequest to the 169 acres that she purposed to convey. The acceptance of a deed with that or a similar provision, instead of constituting an attack on Mrs. Johnson's title, would have clearly amounted to an admission of her title. Besides when the appellant, on May 2, 1957, perfected the appeal, he did so not for himself but for the protection of the interest of his minor daughter. He evidently acted under the advice of learned counsel. The question on that appeal was not so devoid of merit as to constitute inequitable conduct on the part of the appellant in submitting the matter for review and final decision by this Court.

Neither did the appellant's default in the payment of rent make his conduct inequitable because the discharge of that obligation was fully provided for in the contract of sale and purchase.

Manifestly the court was in error both in declining to decree specific performance of the contract and in awarding judgment against the appellant for the rent, interest thereon, and attorney's fees. If specific performance had been required, simultaneously with the

consummation of the contract, the obligation for rent would have been paid and discharged in accordance with the terms of the contract. Consequently the cause must be reversed and remanded, and the trial court is directed to decree and enforce specific performance by each and every party to the contract of each and every act and thing necessary and proper for the full consummation of the contract in accordance with the terms and provisions thereof.

Reversed and remanded with directions.

All Justices concur except *Roberds, Holmes* and *Arrington, JJ.*, who took no part.